UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 5:19-CR-182-GFVT-MAS |
| ) | |
| DARRYL W. STEWART, JR., ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**

This case is before the Court on Defendant Darryl Stewart, Jr.'s ("Stewart") Motion to Suppress. [DE 44]. Hon. Gregory Van Tatenhove referred this matter to the undersigned for a Report and Recommendation. The United States responded to the Motion [DE 49, 50]; Stewart did not reply. The Court held an evidentiary hearing and heard from witnesses and counsel.[1] [DE 51, 52]. For the reasons discussed below, the Court recommends that the District Court deny suppression.

**I.    FACTUAL BACKGROUND**

On the evening of September 3, 2019, Lexington Police Department ("LPD") officers and detectives in separate vehicles were searching for Tavis Chenault ("Chenault"), Stewart's co-defendant, to detain him pursuant to an arrest warrant. [DE 44-2, at Page ID # 143]. Law enforcement, monitoring Chenault's apartment, noticed a 2007 black Lexus turn into Chenault's

---

[1] At the hearing, the Government displayed and introduced into evidence three body camera videos capturing portions of the at-issue events—two from Detective Robert Terry's perspective and one from Detective Steven Hudak's perspective. [*See* DE 52, at Page ID # 174 (Gov't Ex. 1, Terry Body-Worn Camera ("BWC") 1; *id.* (Gov't Ex. 2, Terry BWC 2); *id.* (Gov't Ex. 5, Hudak BWC)].

1

apartment complex. [*Id.*] They observed the vehicle briefly stop in front of Chenault's building, no person entered or exited the Lexus, and the vehicle proceeded to exit Chenault's apartment complex. [*Id.*]

Although some LPD officers remained at Chenault's apartment complex, Detectives Robert Terry ("Terry") and Zakary Ridner followed the vehicle to a nearby Speedway. The Lexus parked near the entrance of the store and, at 10:27 p.m., Terry parked behind the Lexus. [DE 53 (Hr'g Tr.), at Page ID # 182]. Terry observed the driver, later identified as Stewart, quickly exit the vehicle and enter the Speedway. [DE 44-2, at Page ID # 143]. As the passenger exited the vehicle, Terry testified he immediately recognized him as Chenault. [*Id.*; DE 53, at Page ID # 180]. Terry arrested Chenault and, in searching him incident to the arrest, found approximately $1,600 in cash as well as four cell phones Chenault had attempted to discard. [DE 53, at Page ID # 185]. At this point, at 10:31 p.m., Terry called for a canine unit. [*Id.*, at Page ID # 189].

As Terry and others carried out Chenault's arrest, Terry observed Stewart physically distancing himself from the Lexus and the arrest. Stewart repeatedly entered and exited the Speedway store as he attempted to borrow other Speedway patrons' phones to secure a ride away from the Speedway. [*Id.*, at Page ID # 229]. Terry, busy with Chenault, advised the just arriving Detectives Steven Hudak ("Hudak") and Vinlove of Stewart's behavior. [*Id.*; *id.*, at Page ID # 225]. Hudak then approached Stewart and requested identification. Stewart promptly complied. [Hudak BWC, at 00:51–01:15]. The body camera footage captured Hudak, while in possession of Hudak's driver's license, call into "Channel 1" and request general background information about Stewart. [*Id.*, at 01:42–01:46]. Hudak's recitation of Stewart's license number and details on the Channel 1 call is audible. [*Id.*, at 01:55–02:00]. During this, Stewart stood nearby next to another

2

LPD officer as Stewart attempted to make a phone call using a borrowed phone still an effort to leave the scene. [*Id.*, at 02:05–02:40].

After Hudak finished processing Stewart's license information, he asked Stewart to step closer to the Lexus. [*Id.*, at 02:45–02:48]. Stewart inquired, "What's going on?" [*Id.*]. Hudak responded: "You're being detained right now . . . You were driving the vehicle." [*Id.*, at 02:48 – 02:50]. Stewart then asked, somewhat surprised, "I'm being detained?". [*Id.*, at 02:53–02:57]. Hudak answered, "You're not arrested, you're being detained, yes." [*Id.*]. Stewart replied he was not trying to go anywhere. [*Id.*, at 02:57–03:01]. Hudak and Stewart then began walking toward the Lexus. [*Id.*, at 03:01–03:13].

At the same time, Terry—circling the Lexus and looking into the vehicle with a flashlight—alerted the other officers that he had seen a firearm in the driver's side floorboard.[2] [Terry BWC 1, at 00:40–00:47; DE 53, at Page ID # 194–95; DE 51-1 (still photos)]. Terry directed and multiple officers proceeded to take Stewart down onto the pavement and handcuff him. [Terry BWC 1, at 00:50–00:59; Hudak BWC, at 03:45–03:50]. Officers then led a handcuffed Stewart toward the police cruiser and searched his person. [Hudak BWC, at 05:28–07:01].

Not long after Terry saw the firearm, the canine unit (Ness, a narcotics-trained canine, and her handler, Officer Timothy Dawson) arrived.[3] [*Id.*, at Page ID # 195, 242–43 (Dawson testifying that the unit arrived "[a] little after 10:30probably"), 190 (Terry testifying that the canine unit

---

[2] In his Response, Stewart questioned whether Terry truly saw a firearm in plain view in the car. [DE 44-1 at Page ID# 129]. The video and photographic evidence confirm Terry's observation of a firearm through the window in the driver's side floorboard. Regardless, the observed firearm is not the argued basis for the probable cause search of the vehicle.

[3] The Government substantiated on the record, and Stewart has not challenged, Ness's training and qualifications.

3

arrived within "a few minutes" of his request for it)].[4]  Dawson led Ness around the perimeter of the Lexus, and the dog gave a final positive response alerting officers to the odor of narcotics at the passenger's side of the vehicle.[5]  [*Id.*, at Page ID # 245–46].  Detectives then immediately searched the vehicle, uncovering multiple firearms including the one located on the driver's side floorboard.  [Terry BWC 2, at 01:00–02:24].

Later, after receiving the results of the background check on Stewart, LPD learned that Stewart was prohibited from possessing a firearm due to a prior felony conviction.  [DE 53, at Page ID # 230–31].

## II.    ANALYSIS

Stewart seeks to suppress the uncovered firearms, centrally arguing that the officers lacked reasonable suspicion to detain him while they waited for the canine unit to arrive.  He further contends that law enforcement lacked probable cause to search the Lexus.  The Government disagrees, arguing that both reasonable suspicion for Stewart's detention and probable cause for the vehicle search existed at the relevant times.  Further, the United States asserts that, even if the firearms were located during an unconstitutional search of the vehicle, the inevitable discovery doctrine exception to the exclusionary rule would apply and preclude suppression in this case.

For the following reasons, the Court recommends rejection of Stewart's claims.

---

[4] Terry testified that Dawson arrived around the time that officers canceled the "Signal 7" request for officer backup.  [DE 53, at Page ID # 206–07].  Per Terry, the Signal 7 went out at approximately 10:36 p.m., Hudak advised that they have sufficient units about a minute later, and the officers canceled the Signal 7 about a minute after that.  [*Id.*, at Page ID # 189–90].  Dawson also confirmed that, per the dispatch narrative, he had arrived on scene at approximately 10:39 p.m.  [*Id.*, at Page ID # 243–44].  The clear consensus among the various narratives is that the canine arrived within roughly nine to eleven minutes from Terry's request (made at the time of Chenault's arrest).  Stewart does not challenge this timeline.

[5] Officers ultimately found no substantial drug quantity in the vehicle.  Dawson testified, however, that Ness would alert even to the scent of recent or prior drug presence even if the drug were no longer physically present in the vehicle.  [*Id.*, at Page ID # 246–47].

A.     **THE INVESTIGATORY STOP OF STEWART**

"The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010) (quotation marks omitted). "[A]n officer may conduct an investigatory stop only if he 'has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.'" *United States v. Johnson*, 620 F.3d 685, 692 (6th Cir. 2010) (quoting *United States v. Place*, 462 U.S. 696, 702 (1983)). Reasonable suspicion "requires that 'the detaining officers have a particularized and objective basis for suspecting the particular person stopped of criminal activity[.]'" *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). "This standard is less demanding than the probable-cause standard." *United States v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016). The reasonable suspicion calculus demands a "totality of the circumstances" approach, "and a reviewing court view[s] the evidence offered in support of reasonable suspicion using a common sense approach, as understood by those in the field of law enforcement.'" *Id.* (quoting *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004)).

1.    **Timing of Stewart's Detention**

The first issue the Court must address is simply when Stewart was legally detained. A seizure begins when "a reasonable person would have believed that he was not free to leave." *Smith*, 594 F.3d at 536. Relevant factors include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* (internal quotation marks omitted). Further, critically, "an individual must actually submit to the show of authority to be seized within the Fourth Amendment." *United States*

5

*v. Williams*, 615 F.3d 657, 663 (6th Cir. 2010). Accordingly, "a consensual encounter does not amount to a seizure." *Id.* (quoting *United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007)).

Here, the video demonstrates that Hudak and a fellow officer calmly requested Stewart's ID. Stewart, in turn, calmly provided the ID. [Hudak BWC, at 01:00–01:13]. Nothing in the circumstances, as either described via testimony or observable in the video, demonstrates that a reasonable person in Stewart's position would have felt that his freedom to terminate the encounter was conditioned upon production of an ID. *United States v. Ward*, 756 F. App'x 560, 566 (6th Cir. 2018) (finding that "the officers' asking Ward for his identification, asking general questions about what the men were doing, and Ward providing his Social Security number, did not alone constitute a seizure under the Fourth Amendment" where, "[a]side from the general idea that any citizen-police encounter may carry an inherent threat, there [was] nothing in the video record that indicate[d] threat of punishment or violence if Ward did not engage in conversation with the officers"). Indeed, Stewart remained on a phone call, ostensibly still trying to secure a ride away from the scene, during the time that Hudak was requesting and examining Stewart's ID. The two officers did not have weapons drawn, were speaking calmly and in a non-threatening manner, and had not asked Stewart to accompany them anywhere before or at the time that they reviewed the ID. *See Campbell*, 486 F.3d at 956 (explaining that "no seizure occurs when police ask questions of an individual, [and] ask to examine the individual's identification, . . . so long as the officers do not convey a message that compliance with their requests is required"); *cf. Ward*, 756 F. App'x at 565 (noting that "an officer's threatening tone can change a consensual interaction into a seizure"); *see also United States v. Garcia*, 866 F.2d 147, 151 (6th Cir. 1989) ("[T]he one occurrence which seems to distinguish 'seizures' from casual contacts between police and citizens is when the defendant is asked to accompany the police or agents to a place to which the defendant had not

6

planned to go."). Nor had law enforcement, at that point, accused Stewart of any crime. *See United States v. Williams*, 615 F.3d 657, 664 (6th Cir. 2010) (observing that "the Supreme Court [has] cited a criminal accusation by law enforcement as a factor indicating that an individual is seized").

Moreover, and as an independent and overlapping reason to conclude that seizure had not yet begun when officers requested Stewart's ID, Stewart voluntarily provided his license to Hudak. The video confirms that Stewart's production of the ID was uncoerced and entirely volitional. [Hudak BWC, at 01:13–01:15]. This then-consensual encounter did not yet amount to a Fourth Amendment seizure. *See Williams*, 615 F.3d at 663.

At the evidentiary hearing, defense counsel questioned the order of these events.[6] Namely, counsel suggested that Stewart's detention officially commenced prior to Hudak's request for Stewart's ID when the other officer with Hudak had informed Stewart he was detained. The body camera footage, however, refutes this suggestion. The officer did make this statement, but it was well after Hudak had told Stewart he was detained. Moreover, Stewart's conduct, namely still trying to leave the scene and surprise as Hudak's declaration that Stewart was detained, greatly undercut any argument that Stewart believed he was detained sometime prior to Hudak informing him as much.

The investigatory stop began, rather, when Stewart asked to leave the immediate presence of the officers to talk to an acquaintance at the scene, and Hudak responded that Stewart was not permitted to do so because Stewart was "being detained." *See, e.g.*, *United States v. Brown*, 447 F. App'x 706, 711 (6th Cir. 2012) ("When Officer Pesa denied Brown's request to leave, the

---

[6] Stewart's efforts to contest the order of events is also relevant to the inevitable discovery doctrine's application discussed *infra*.

7

encounter changed from voluntary to compulsory."). Hudak's express direction not to leave, in response to Stewart's question, unquestionably would have given a reasonable person in Stewart's circumstances the impression that he was not free to leave. *See Williams*, 615 F.3d at 663 (recognizing that, in certain circumstances, "words alone may be enough to make a reasonable person feel that he would not be free to leave"). And, further, Stewart indeed submitted to Hudak's assertion of authority. [DE 53, at Page ID # 226 (Hudak testifying that Stewart did not ultimately go and talk with his friend, as he had asked to do)]. Accordingly, the video and testimonial evidence demonstrates that Stewart's detention began, for Fourth Amendment purposes, when Hudak told Stewart that he was being detained.

### 2. **Reasonableness of the Investigatory Stop**

Now that the Court has determined when the investigatory stop began, the Court turns to the issue of whether the stop of Stewart was reasonable based upon Hudak's suspicions at that moment. The investigatory stop inquiry entails "a two-part analysis of the reasonableness of the stop." *Smith*, 594 F.3d at 536. Courts "first ask whether there was a proper basis for the stop and, if the stop was proper, then . . . determine whether the degree of intrusion . . . was reasonably related in scope to the situation at hand." *Id.* (internal quotation marks omitted). "An investigatory stop of an individual by a law enforcement officer is proper so long as there is a reasonable basis for the stop." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 22–24 (1968)).

As noted, the Court looks at the totality of the circumstances as they existed at the time of the stop and evaluates whether they give rise to an objectively reasonable suspicion of criminal activity. Here, as Hudak confirmed at the evidentiary hearing, the relevant circumstances were: (1) the fact that Stewart had been driving the arrested Chenault, whom the officers believed to be involved in narcotics trafficking; (2) the fact that the officers observed Stewart seeking to physically distance himself from the Lexus; and (3) the related fact that Stewart was asking others

8

in the parking lot to borrow a phone, evidently seeking to get a ride away from the Speedway. [DE 53, at Page ID # 229].

Stewart argued that his simple presence with Chenault did not provide reasonable suspicion for the stop. Although "a person's mere propinquity to others independently suspected of criminal activity does not, **without more**, give rise to probable cause to search that person, . . . such association is a relevant factor in determining reasonable suspicion." *United States v. Keeling*, 783 F. App'x 517, 523 (6th Cir. 2019) (internal quotation marks and citation omitted; emphasis added); *see also United States v. Stepp*, 680 F.3d 651, 667 (6th Cir. 2012) (recognizing that "associating with a suspected drug dealer immediately prior to entering a vehicle substantially contributes to reasonable suspicion of a drug offense"). The Court agrees; however, there is **more**.

In addition to Hudak's knowledge of Stewart's association with Chenault, Hudak had also observed Stewart's notably odd behavior, fairly indicating to a reasonable person in the moment a clear desire to flee the scene. *See, e.g.*, *United States v. Logan*, 526 F. App'x 498, 503–04 (6th Cir. 2013) (finding that the defendant's efforts to "distance himself from the passenger's seat of the vehicle" factored into the reasonable suspicion analysis); *United States v. Smith*, No. 3:09-CR-147, 2010 WL 1543851, at *3 (E.D. Tenn. Apr. 16, 2010) (noting that a defendant's "attempt[] to leave the scene of the investigation when" authorities arrived contributed to officers' reasonable suspicion that he was involved in criminal activity); *cf. United States v. Clark*, No. 1:10-CR-160, 2011 WL 2619081, at *3 (E.D. Tenn. Apr. 8, 2011), *report and recommendation adopted*, No. 1:10-CR-160, 2011 WL 2619076 (E.D. Tenn. July 1, 2011) (observing that, "in combination" with other factors, "the defendant's originally distancing himself from the car" helped give rise to probable cause); *see also United States v. Colbert*, No. 3:10-CR-151, 2011 WL 2746811, at *4 (W.D. Ky. July 13, 2011), *aff'd*, 525 F. App'x 364 (6th Cir. 2013) (acknowledging that the fact

that the defendant "was attempting to flee or distance himself from the vehicle" factored into officers' reasonable suspicion); *United States v. Preston*, No. 3:18-CR-185, 2020 WL 1227197, at *2 (S.D. Ohio Mar. 13, 2020) (concluding that reasonable suspicion arose where, among other facts, the defendant was "apparently wanting to distance himself from the Kia and its contents"). In context, Stewart's consistently observed behavior amounted to more than a mere display of casual nervousness in the face of an officer stop. *Cf. United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) (noting that nervousness typically "is an unreliable indicator, especially in the context of a traffic stop").[7] Stewart was making concerted, discernable efforts to physically separate himself from the Lexus, even approaching strangers to borrow a phone and request a ride. [DE 53, at Page ID # 211 (Hudak testified: "It was my belief that he was distancing himself from the vehicle and attempting to gain a ride from somebody else.")]. This conduct would have legitimately impacted Hudak's assessment of whether Stewart was involved in the same criminal activity as his passenger, Chenault.

Of course, "even where the government points to several . . . valid considerations in forming reasonable suspicion, they may not together provide reasonable suspicion if they are all relatively minor and subject to significant qualification[.]" *Stepp*, 680 F.3d at 665 (internal quotation marks omitted). This is especially true "where the case lacks any of the stronger indicators of criminal conduct that have accompanied these minor factors in other cases." *Id.* (internal quotation marks omitted). But Stewart's conduct is, as discussed, considerably more

---

[7] Nervousness, though it would not carry the day, is nevertheless still relevant to the full calculus. *See United States v. Shank*, 543 F.3d 309, 317 (6th Cir. 2008) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)) ("The Supreme Court has 'recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.'"). Hudak and Terry creditably testified that Stewart's abnormally evasive behavior triggered officer suspicion, in view of their training and experience.

suspicious than mere nervous demeanor (which the *Stepp* Court characterized as a relatively minor factor); the conduct here involved concrete, persistent efforts to physically distance from the crime-associated vehicle. Further, the video record and the testimony largely substantiate Hudak's impression of Stewart's behavior; Hudak's observations thus are, certainly, not "subject to significant qualification" in this case. Consistent with the *Stepp* outcome, Stewart's observed behavior in relation to the car, together with the officers' knowledge of Chenault's association with the vehicle and ongoing trafficking involvement, gave rise to reasonable suspicion that Stewart was involved in related criminality. 680 F.3d at 665 (finding that even "weak indicators of criminal activity, when combined with the [vehicle] occupants' past history of narcotics activity and their vague travel plans," gave rise to reasonable suspicion).

Accordingly, under the totality of the circumstances, the collective balance of factors rose to the level of reasonable suspicion. *See Richardson*, 385 F.3d at 631 ("We recognize that even a string of innocent behavior added together may amount to reasonable suspicion of criminal activity."); *United States v. Garner*, 46 F. App'x 278, 286 (6th Cir. 2002) (finding reasonable suspicion for a stop where the detaining officer was "aware that [the defendant] urgently wanted to leave" and knew that the other occupant of the vehicle may have had an outstanding arrest warrant). The reasonable, commonsense inference is that Stewart wanted to disassociate himself from the Lexus and Chenault so that officers would not discover that Stewart, too, was engaged in criminal activity. Hudak, like any reasonable officer, rightfully perceived these facts and had objective and particularized grounds for detaining Stewart, clearing the reasonable suspicion bar for detention. *See United States v. Coker*, 648 F. App'x 541, 544 (6th Cir. 2016) (emphasizing that "[r]easonable suspicion is not a high bar" and "the officer needs only a minimal level of objective justification") (internal quotation marks omitted).

11

B.     SCOPE AND DURATION OF STOP

Stewart perfunctorily challenged, at the hearing, the extent of the stop, briefly arguing that the use of a narcotics dog was unlawful under the circumstances.[8] The record and relevant authority refutes the contention. Importantly, a canine sniff itself does not "constitute a search within the meaning of the Fourth Amendment[,]" as "use of a well-trained drug dog does not in itself implicate any legitimate privacy interests." *United States v. Perez*, 440 F.3d 363, 375 (6th Cir. 2006). The situation becomes unlawful only if the sniff unreasonably prolongs the initially proper detention beyond what is reasonably necessary to achieve the purpose of the stop. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "Simply put, an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (internal quotation marks omitted). "[T]here is no rigid time limitation on the lawfulness of a *Terry* stop." *Id.* (internal quotation marks omitted). Rather, the Court must "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.*

The record in this case is clear that the canine unit arrived within roughly ten minutes of Chenault's arrest, which itself occurred before Stewart's detention even began. During that time, officers were awaiting information concerning the Channel 1 inquiry into Stewart's license status. [DE 53, at Page ID # 218–19 (Hudak testifying that, at the point he detained Stewart, he was "waiting to hear back from [the] information channel"); *id.*, at Page ID # 226–27 (Hudak testifying that he did not receive information about Stewart's license until after Terry found the gun and

---

[8] As the Government (and Court) recognized, Stewart's written motion does not clearly raise this issue.

12

officers had placed Stewart in handcuffs)]. Confirming validity of Stewart's license, given his role as driver of the Lexus, was undoubtedly a legitimate purpose of Stewart's initial detention. [*Id.*, at Page ID # 198 (Terry testifying that "Stewart had been operating the vehicle, so [the officers] wanted to at least identify him to make sure he had a valid license"); *id.*, at Page ID # 220 (Hudak testifying that he detained Stewart pending receipt of information about his license)]. *See Bell*, 555 F.3d at 542 (noting that "[w]aiting for the results of the license check was clearly within the purpose of the initial stop, and only while waiting for the results of that check did" the officers discuss calling for a drug dog).

As discussed, the officers reasonably suspected that the Lexus was associated with narcotics activity and that Stewart, its driver, was actively trying to leave the scene. A routine check of Stewart's license was unquestionably within the scope of the resulting stop. The canine unit's arrival and Ness's sniff search of the outside of the vehicle all within minutes of Stewart's initial detention did not unreasonably extend the scope or duration of the stop under the circumstances. Rather, the dog sniff amounted to a quick and minimally intrusive investigative tactic calculated to quickly confirm or deny the officers' suspicion that Stewart and the Lexus were linked to drug activity. *See* Davis, 430 F.3d at 354 (finding that officers had "reasonable suspicion to detain [a driver] for the additional approximately thirty to forty-five minutes it took for the police to bring the first drug-sniffing dog to the scene and have the dog check the vehicle for the presence of narcotics"); *United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) (concluding that the defendant "was not detained for an unreasonable length of time" where officers spent "approximately 35 minutes . . . waiting for a canine unit to arrive[,]" and "[t]he entire investigation thus lasted for less than one hour"); *United States v. Garcia*, 496 F.3d 495, 504 (6th Cir. 2007) ("The officers reasonably suspected the Suburban's occupants of illegal drug trafficking, and the

13

canine narcotics sniff is directly related to investigating this suspicion. Moreover, the duration of the stop was reasonable; the canine sniff was performed within a half hour of the stop[.]").

Stewart has neither offered authority nor pointed to facts showing that the canine sniff, conducted within approximately ten minutes of stop initiation, improperly exceeded the investigatory stop scope or duration under the circumstances of this case.

### C. THE VEHICLE SEARCH

In conjunction with the other facts known to the officers (including Chenault's presence in the car, Chenault's outstanding arrest warrant, officers' awareness that Chenault had been involved in drug trafficking, the cell phones and cash found on Chenault upon arrest, and Stewart's obvious efforts to distance himself from the vehicle), Ness's final positive response[9] established probable cause for the vehicle search.[10] *See United States v. Patton*, 517 F. App'x 400, 402 (6th Cir. 2013) (citing *United States v. Diaz*, 25 F.3d 392, 393–94 (6th Cir. 1994)) ("[A]n alert by a properly trained narcotics dog while sniffing a vehicle is sufficient to establish probable cause for a search of the vehicle."); *United States v. Howard*, 621 F.3d 433, 454–55 (6th Cir. 2010) (agreeing with the district court that "[t]he dog sniff provided the best reason to believe contraband might be found in the Suburban," and, combined with other suspicious circumstances, would convince "a man of reasonable prudence . . . that contraband or evidence of a crime would be found in" the vehicle) (internal quotation marks omitted); *United States v. Stubblefield*, 682 F.3d 502, 507 (6th

---

[9] The defense has not meaningfully challenged Ness's training or qualifications, or Dawson's methodology in conducting the sniff. The hearing record (Dawson's testimony) confirms reliability of Ness's alert, given her precise training in this context and Dawson's intimate familiarity with her response spectrum.

[10] Terry's observation of the gun through the window did not add to the quantum of cause justifying the vehicle search, as the officers did not then know of Stewart's prohibited status. [DE 53, at Page ID # 198–99 (Terry testifying that, because he did not know that Stewart was prohibited from possessing a firearm at the time Terry saw the gun through the window, he did not perceive the gun's plain view visibility as justifying the search)].

Cir. 2012). Against the backdrop of pertinent Sixth Circuit case law, the record reveals no constitutional violation attendant to the post-sniff vehicle search.

### D. INEVITABLE DISCOVERY DOCTRINE

Lastly, even if the sniff-based search and foundational investigatory stop were constitutionally defective, the inevitable discovery exception to the exclusionary rule would preclude suppression of the found firearms in this scenario. "The inevitable discovery doctrine allows unlawfully obtained evidence to be admitted at trial if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means." *United States v. Mohammed*, 512 F. App'x 583, 587 (6th Cir. 2013). In evaluating doctrinal applicability, "a court must determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." *Id.* (internal quotation marks omitted).

Before the detention of Stewart and the search of the vehicle's interior, Stewart had voluntarily provided Hudak with his identification. Thus, regardless of what happened next, law enforcement would learn that Stewart was a person prohibited from possessing a firearm due to his prior felony conviction. [DE 53, at Page ID # 230–31]. And with that knowledge and the inevitable viewing of the firearm in the driver's side floorboard, Stewart was always going to face the current charge even absent his detention or canine alert. *See United States v. Frederick*, 152 F. App'x 470, 474 (6th Cir. 2005); *United States v. Matthews*, 422 F. Supp. 3d 1235, 1255 (W.D. Ky. 2019) ("Because the police would inevitably have discovered that Matthews was a convicted felon after performing a routine identity check, they would have inevitably had probable cause to seize the weapon they saw underneath the driver's seat, even if they had waited until after they discovered Matthews was a convicted felon."). Such circumstances surely would have supplied probable cause to arrest Stewart, as the vehicle's driver, permitting officers to then search the car

15

for additional evidence related to the suspected crime. *See Campbell*, 486 F.3d at 955 ("Once a lawful arrest has been made, the police officer is permitted to search the individual . . . This includes a search of the individual's vehicle.") (internal citations omitted); *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998) ("[A]n officer may search a readily mobile vehicle without a warrant if he has probable cause to believe that the vehicle contains evidence of a crime.").

The hearing testimony establishes by a preponderance of the evidence that, even absent the dog's presence and alert, the officers would have lawfully discovered and seized the firearms inside of the Lexus after learning that Stewart was a prohibited person.[11] That the officers in fact seized the guns through the sniff-based search, before learning of Stewart's status, is immaterial; the result would have been the same. The inevitable discovery doctrine applies, and, in the event Hudak in fact lacked reasonable suspicion to detain Stewart pending the canine unit's arrival, exclusion of the uncovered firearms would nonetheless be unwarranted on this record.

### III.   CONCLUSION

For the reasons discussed, the Court **RECOMMENDS** that the District Court **DENY** Stewart's suppression effort. The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of the statute. As defined by § 636(b) (1), FED. R. CRIM. P. 59(b), and local rule, **within fourteen days** after being served with

---

[11] It matters not whether the officers could confirm Stewart's ownership or possession of the observed gun. Under the circumstances, the fact that the officers witnessed Stewart driving the vehicle (and seated near one ultimately discovered firearm), saw the gun in plain view in the car, and knew of Stewart's prohibited status would have been sufficient to establish probable cause. *See, e.g.*, *United States v. Pigg*, No. 1:17-CR-00005, 2019 WL 542305, at *6 (M.D. Tenn. Feb. 11, 2019) ("The issue is whether the firearm and ammunition in plain view, in a car (whether or not constructively possessed by Defendant) in which two officers had just observed Defendant, combined with Defendant's statement that he was a felon, gave rise to probable cause that the Jeep contained evidence of a felon in possession of a firearm crime. This question must be answered in the affirmative.").

16

a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, *de novo*, by the District Court.

Entered this 3rd day of September, 2020.



Signed By:
Matthew A. Stinnett
United States Magistrate Judge